## CLAUSSE v. FIRST SECURITY CORP. et al.

No. 7930.   Decided Sept. 30, 1953.   (261 P. 2d 375.)

*Herbert B. Maw,* Salt Lake City, for appellant.

*Young, Thatcher & Glasmann,* Ogden, *Fabian, Clendenin, Moffat & Mabey, Peter W. Billings,* Salt Lake City, for respondents.

WOLFE, Chief Justice.

Plaintiff, Marie C. Clausse, as administratrix of the estate of Leon L. Clausse, deceased, sued First Security Bank of Utah and the American National Insurance Company, defendants, to recover $2,000 claimed as due and owing under an alleged oral contract of mortgage insurance between deceased and defendants. From a judgment of dismissal in favor of each of the defendants, plaintiff appeals urging that the trial court erred (1) in striking certain testimony of plaintiff and her son, Roscoe Clausse, and (2) in granting a motion of dismissal in favor of each of the defendants on the ground that there were insufficient facts to warrant the case being submitted to the jury. It is not clear from the record whether the court did strike any of the testimony of the plaintiff and her son. However, considering all the evidence, it is clear that the trial court did not err in entering a judgment of dismissal in favor of each of the defendants.

About December 18, 1948, Mr. and Mrs. Clausse, decedent and plaintiff, respectively, made application to defendant Bank for a loan of $2,500 to be secured by a mortgage on their home. On the afternoon of December 18, 1948, Mr. Carl Porter and Mr. S. T. Jeppeson, Vice Presidents of defendant Bank, visited the Clausse home to appraise it. They found the house to be of satisfactory security value and told the Clausses that the loan and mortgage would be approved. Mrs. Clausse testified that at that time Mr. Jeppeson stated to her husband that the Bank had a plan with an insurance company that would take care of the mortgage in case anything happened to him; that he did not write the insurance plan but he would send out a representative to write the plan; that payments could be added to the mortgage installments and be paid to the bank along with payment of the mortgage; that the first payment could be made on the first of February; and that her husband told Jeppeson that he would like to take the insurance but wanted coverage of only $2,000 instead of $2,500.

Mrs. Clausse further testified that at this time Jeppeson and Porter handed the deceased a pamphlet entitled "Mortgage Cancellation Plan." The first page of that pamphlet states in bold face type, "Mortgage Cancellation Plan — a home for the family." The text in substance explains the desirability of having a home, mortgage free, and points up the problems a family is faced with when the breadwinner dies and the family home remains mortgaged. The brochure offers the First Security Mortgage Cancellation Plan as the solution to the problem arising from the death of the breadwinner in a family. Inquiries concerning the plan are solicited.

Sometime between the 18th and the 23rd of December, 1948, Mr. and Mrs. Clausse executed a note for $2,500 and a mortgage on their home in favor of the Bank. The note was due January 1, 1954, and was made payable in monthly installments of $49.50 commencing in February, 1949. The monthly installments included interest but did not include any premium for insurance.

Mrs. Clausse testified that when she delivered the instruments to the Bank she again talked with Mr. Jeppeson. She testified:

"Mr. Jeppeson told me that Lee [decedent] had authorized him to go ahead with the insurance. He would send the representative out, and it would be added to the installments to be paid at the bank and that he would send him out, that he didn't write the insurance, the mortgage insurance, but he would send the representative out to the house."

About the 27th day of December, 1948, plaintiff and her husband received a letter bearing the heading, "Real Estate Management Company," which company on or prior to that date was absorbed by the Bank and which for the purposes of this action may be considered the Bank. The material portions of the letter are set out below:

"In line with the policy of many loan companies * * *, we have worked out with the American National Insurance Company a plan,

which at a very nominal cost, will guarantee the payment of your mortgage for you in case of your death, and at the same time, will be a savings plan for you.

*    *    *    *    *    *    *    *

"This protection can be obtained for you entirely upon your approval, leaving you to make the decision whether or not you want to carry it until after you have had an opportunity to examine the contract. I am asking Reynolds Blackington, local representative of the American National Insurance Company, to call on you in the near future and explain this plan to you. You may listen to his explanation without feeling that he is there to sell you additional life insurance, but rather to explain to you a plan which be believe is very desirable, and to give you the opportunity to carry it, if you so desire.

"Very truly yours,
"J. D. Madson
"Assistant Secretary."

At the time of the occurrences relating to this controversy, J. D. Madson was an assistant Vice President of the defendant Bank.

January 5, 1940, Reynolds Blackington, the representative of the American National Insurance Company mentioned in the Madson letter, visited the Clausse home. Mrs. Clausse testified that Blackington stated that Mr. Jeppeson had asked him to come out and go over the plan. Mrs. Clausse further testified:

"They [Blackington and decedent] went over the questions [of the insurance application] together, and Mr. Blackington explained that it would be paid along with the mortgage at the bank each month, and Lee told him that he had already made arrangements with Mr. Jeppeson to take care of them at the Bank, and Mr. Blackington said that it was O. K. that they handled all of them."

Mrs. Clausse stated that the deceased read the application for insurance and signed it. She testified that the insurance doctor examined her husband the following day and pronounced him "*** in perfect condition ***." She further stated that Blackington said that the plan "*** would take

effect immediately, all during the period of the mortgage." On cross-examination she stated that it was to take effect "*** immediately when he was there that night."

At various times during the cross-examination of Mrs. Clausse the following interchanges with counsel took place:

"Q. * * * you understood, did you not, that what Mr. Jeppeson said was that if you and your husband desired to avail yourself of a plan, which was available that you might take out an insurance policy upon his life; that was it? A. That is correct, it was—

"Q. A life insurance policy on the life of either yourself or your husband, or both, as you might desire; that was the substance of it? A. Well, yes, to cover, in case anything happened to him, it would cover the mortgage.

\* \* \* \* \* \* \* \*

"Q. In other words, a life insurance policy in case he died, then there would be money available from the proceeds of the policy to pay it; that was it, wasn't it? A. He was insured: that was it.

\* \* \* \* \* \* \* \*

"Q. So you knew that the Bank wasn't going to pay it unless there was a policy issued by the Insurance Company, so that the Insurance Company would pay the policy? didn't you? A. Yes.

"Q. Did you understand that the Bank was going to pay that policy? A. No, we was to make payments at the Bank, where they would reimburse the insurance company.

\* \* \* \* \* \* \* \*

"Q. You understood that Mr. Jeppeson didn't write any insurance, didn't you? A. Yes.

"Q. All he would do would be to send the insurance agent out to your husband's home if you people wanted to act on it: wasn't that it? A. He worked with the First Security Bank, yes."

The testimony of Roscoe Clausse is substantially in accord with the testimony of plaintiff.

Mr. Clausse died on January 24, 1949, at which time no premium payments had been made by him to either the Bank or the Insurance Company. The defendant Insurance Company had issued no policy.

Plaintiff contends that from the foregoing evidence it may be inferred: (1) that an offer of mortgage insurance had been made by Mr. Jeppeson and Mr. Porter to the deceased and that the offer was accepted by him; (2) that the consideration (monthly premiums to be paid by the deceased to the Bank) had been agreed upon and the deceased had authorized the Bank to add the insurance premiums to his monthly payments on his note and mortgage, in return for which the Bank agreed to cancel the mortgage in case of his death; (3) that the insurance took effect on the signing of the note and mortgage.

Contrary to plaintiff's contentions, the trial court correctly entered a non-suit in favor of defendant Bank. There is insuffiicent evidence to warrant a finding of (1) an oral offer on the part of the Bank to insure the mortgage, and (2) an acceptance on the part of the decedent of the purported oral offer of the Bank. The evidence does indicate that the agents of the Bank "sold" decedent on the "idea" of taking out a policy of insurance on his life, the proceeds from which could be used to cancel the mortgage in the event that he died. It is clear that the agents of the Bank, undertook to send to deceased a representative of the American National Insurance Company to write the insurance. There is no evidence that an oral contract of "mortgage insurance" took effect upon the execution of the note and mortgage by the Clausses as is contended by plaintiff. The letter written by Mr. Madson on December 27th to the Clausses indicates that the insurance was at that time yet to be written. The visit of Mr. Blackington on the 5th of January is probative of the absence of insurance prior to that time. Plaintiff answered affirmatively the question:

"So you knew that the Bank wasn't going to pay it [the mortgage] unless there was a policy issued by the Insurance Company, so that the Insurance Company would pay the policy; didn't you?"

She further testified that she knew that Mr. Jeppeson didn't write any insurance and that all he would do would be to send the insurance agent out to her home. Such evidence is insufficient to make out the elements of an oral contract of mortgage insurance between the bank and deceased.

The court correctly entered a judgment of dismissal in favor of defendant Insurance Company. The evidence shows that Mr. Blackington visited deceased on the 5th of January, 1949, about 12 days after the Clausses had executed the note and mortgage in favor of the Bank. He indicated that Mr. Jeppeson had sent him. Mrs. Clausse testified that deceased read and signed a written application for insurance. The Bank was made beneficiary. No premium was paid or tendered by Mr. Clausse at the time the application was signed. The application provided in paragraph (e) thereof:

"Insurance liability of the company by reason of this application shall be created only as follows: One. Either in accordance with the terms of the aforementioned conditional receipt properly executed and delivered; or Two. By complete and concurrent fulfillment at the time of any policy delivery of three (3) conditions as follows: (i) Issue of such policy and actual delivery of same during the lifetime and good health of the person to be insured must have taken place; (ii) The whole premium (or regular installment thereof) must have been settled for and accepted by the Company or its authorized agent; and (iii) Neither the Company nor any person, the Company's agent or not, shall by such delivery or otherwise determine at the time thereof the existence of such good health, but acceptance of such policy by the undersigned shall be deemed representation that then and theretofore no change in such good health has taken place since the date hereof."

The conditional receipt was never issued. No policy was ever issued or delivered prior to Mr. Clausse's death. Counsel for defendant Insurance Company maintains that the application represents the written integration of the parties and their rights and duties are controlled by the terms therein stated. Such is generally held to be the law. See *Field* v. *Missouri State Life Insurance Company*, 77 Utah 45,

290 P. 979. Plaintiff makes no claim against the insurance company based on *the application for life insurance*. She argues that the application was executed merely because it was one of the things which had to be done by the deceased in order that he might receive protection on his mortgage under the Mortgage Cancellation plan which had been worked out between the Bank and The Insurance Company. This contention finds no support in the evidence as heretofore set forth. In fact, it is contradicted by the testimony of plaintiff elicited on cross-examination wherein she indicated (1) the policy intended was one for life insurance, (2) the proceeds of the policy were to be used to pay the mortgage (3) the bank was not going to pay the mortgage unless a policy was issued by the insurance company, (4) she knew Mr. Jeppeson (a vice president of the Bank) did not write insurance. In addition it is significant that the amount of insurance sued for is $2,000 and the amount of the mortgage was $2,500. This fact is inconsistent with the contention of the plaintiff that the Bank agreed to cancel the mortgage.

On the facts heretofore set forth a reasonable mind could not find that the requisite steps necessary to impose liability on defendant Insurance Company had been complied with. Nor is there any evidence of omissions by defendants of the doing of an act which they promised or had the power to do upon which a case could be built. This is the usual situation where the obligation of the Insurance Company awaits upon the consummation of an effective written contract.

Affirmed. Costs to respondents.

McDONOUGH, CROCKETT and HENRIOD, J.J., concur.

WADE, Justice (dissenting in part and concurring in part).

I concur with the dismissal as to the Bank but I think the evidence would sustain a finding of liability against the

insurance company. The trial court having granted a nonsuit, if the evidence when considered in its most favorable light to the plaintiff would reasonably support the finding of facts sufficient to sustain a judgment against the defendants or either of them, the case should be reversed.

Mr. Jeppeson represented to the decedent that the Bank had a plan with the insurance company that would take care of the mortgage in case anything happened to him, and that payment for this plan could be added to the mortgage installments and paid to the bank along with the payments cn the mortgage with the first payment to be made on the first of February. This representation was followed by a letter of December 27, 1948, from the bank which stated in part:

"* * * we have worked out with the American National Insurance Company a plan which * * * will guarantee the payment of your mortgage for you in case of your death * * *.

"This protection can be arranged for you entirely upon your approval, leaving you to make the decision whether or not you want to carry it until after you have had an opportunity to examine the contract. I am asking Mr. Reynolds Blackington, local representative of the American National Insurance Company, to call on you in the near future and explain this plan. * * *"

From these representations the deceased would be justified in believing that if he made application for insurance under this plan the mortgage would be paid therefrom, to the extent of the amount of the insurance, in case of his death and that the insurance would be issued as soon as possible after he gave his consent or approval giving him the option to cancel it if he so desired after examining the policy. He was definitely assured that upon his approval the policy would take effect immediately without waiting for the first payment.

On January 5, 1949, pursuant to those representations Blackington the insurance company's agent called and repeated these representations. He again asserted that the premiums were to be paid along with the regular monthly

payments on the mortgage to the Bank. The deceased approved the policy for $2,000 and after reading the application deceased signed it and took the physical examination the next day wherein he was pronounced in perfect condition. The deceased, at that time, had complied with every condition that he was requested to meet in order to make the policy effective. He had been assured that upon meeting such requirements the policy would go into effect immediately, but no policy nor conditional receipt required by the application to make the insurance effective had been issued until nineteen days had elapsed when the decedent unexpectedly died. I think the evidence is such that it could reasonably be inferred therefrom that had deceased lived until the first premium payment was made the insurance company would have claimed that the insurance had been effective from the date of the application and would have charged a premium thereon from that date.

If such is the case then the insurance company under the prevailing opinion had it within its power to withhold the issuance of the policy or of the conditional receipt until after the premium had been paid and then choose in accordance with its interest at that time whether or not to claim that the insurance had been in effect from the date of the application to the date that the first payment became due. Thus, it could collect the insurance premium if at the time the first premium became due the insured was in good health but could refuse to pay the policy in case he died in the meantime, if such is the case a grave injustice has been done to the deceased's family.

Clearly it would be a reasonable inference from the record that both the Bank's agent and the agent of the insurance company represented that the insurance would become effective upon the approval of the deceased and his passing the physical examination, and that upon his complying with these requirements the insurance company would take the necessary steps to make the insurance policy effective immediately but that 19 days had elapsed before his death

which would give ample time for the insurance company to make the policy effective had it lived up to its agreement, but that it had failed to live up to its agreement. This is not a case where the agents of the insurance company have made representations beyond their authority to make for there can be no doubt that the ordinary insurance company agent (and this includes the agents of the bank in this case) have authority to represent that an insurance policy will be issued and made effective immediately upon the applicant meeting the company's requirements. Here the failure seems to be on the part of the insurance company to live up to its agreement and either issue the conditional receipt or issue the insurance policy immediately after the deceased had met all the requirements to be performed by him in order to make the policy effective. Under such circumstances I think we should hold that the policy went into effect regardless of the failure on the part of the insurance company for it should not be allowed to avoid liability contrary to its agreement merely because it failed to comply with that agreement.[1]

---

[1]See *Gressler* v. *New York Life Insurance Company*, 108 Utah 182, 163 P.2d 324, 164 A.L.R. 1047 and *Parker* v. *California State Life Insurance Company*, 85 Utah 595, 40 P.2d 175.